

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 10, 2025

**BY EMAIL AND ECF**

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:    *United States v. Kifano Jordan a/k/a "Shotti,"* S7 18 Cr. 834 (PAE)

Dear Judge Engelmayer:

      The Government respectfully submits this letter in opposition to defendant Kifano Jordan's motion for compassionate release pursuant to 18 U.S.C. § 3582(c) ("Motion" or "Mot."), ECF No. 711. The Motion should be denied. First, notwithstanding the defendant's chronic pancreatitis, he has failed to demonstrate an extraordinary and compelling reason justifying a the requested sentence reduction. Second, based on the defendant's conduct and criminal history, and because he has not yet served even half of the 180 months of imprisonment imposed by the Court, the Section 3553(a) factors weigh strongly against a sentencing reduction.

    **I.**    **Background**

      The defendant was one of the highest-ranking members of the Nine Trey Gangsta Bloods ("Nine Trey"), a violent set of the Bloods gang. As set forth more fully in the Government's sentencing submission, dated August 30, 2019 (ECF No. 288), the defendant was personally involved in or present for numerous serious and alarming acts of violence, including a November 2017 assault of a rival gang member; a March 20, 2018 shooting near Times Square; an April 3, 2018 armed robbery in midtown Manhattan; two shootings on April 21, 2018 – one in which the defendant shot at two individuals and a separate shooting inside the Barclays Center; a June 2, 2018 shooting at a rival gang member; a July 16, 2018 shooting in Brooklyn; and an October 26, 2018 assault that resulted in Faheem Walter, a/k/a "Crippy," getting shot in the stomach. (ECF No. 288 at 2–4.) The defendant was also involved in procuring firearms for Nine Trey and in dealing heroin. (Id. at 4.)

      In addition to these acts of violence, the defendant was captured on an audio recording in the days following the kidnapping of fellow Nine Trey member Daniel Hernandez, a/k/a "Tekashi 6ix 9ine," during which the defendant said, among other things, that because Hernandez was robbed, the defendant would have to retaliate; that he was routinely armed with an assault rifle;

and that when fellow Nine Trey leader Jamel Jones, a/k/a "Mel Murda," had been robbed in the past, the defendant retaliated by shooting five people.

The defendant was arrested on November 18, 2018, and has been detained since that date. The initial Indictment charged him in six counts, including racketeering conspiracy, violent crimes in aid of racketeering, and firearms use. On March 28, 2019, the defendant pleaded guilty, pursuant to a plea agreement, to a two-count Superseding Information, for his possession of a firearm in furtherance of the above-mentioned April 3, 2018 robbery and his discharge of a firearm during the above-described April 21, 2018 shooting.

The Presentence Investigation report detailed the defendant's prior convictions, including criminal possession of a loaded firearm, reckless endangerment, theft, and attempted assault.

On September 6, 2019, the defendant appeared before this Court for sentencing. In imposing the mandatory minimum term of imprisonment, to be followed by five years' supervised release, this Court reasoned that:

> [A] 15-year sentence is richly warranted in your case. . . From the perspective of just punishment, this conduct demands a long sentence. During a period of a little under a year, you were behind an alarming spree of shootings and other acts of revenge. Those shootings could easily have resulted in multiple deaths. Shooting five shots into a moving car alone, as you did, could have caused a large number of casualties. Through some combination of sheer luck and bad aim, no one died from your conduct, but that is no thanks to you. The fact that you not only shot at others yourself but directed others to do so makes your crime all the more serious.

(ECF No. 329 at 17-19). The Court also noted that a 15-year sentence was warranted for purposes of general deterrence ("Gang violence in this city and this country is epidemic. The dockets in this courthouse make that plain. . . It's imperative that the sentences in these cases, taken as a whole, convey a message that is sufficient to get the next would-be gang member to think twice before joining a gang or committing violence in support of it") and specific deterrence, noting that the defendant's multiple past criminal convictions, including for crimes of violence, "should have gotten the message across to you to stop engaging in violence . . . [and] should have served as wake-up calls for you, but they didn't." (*Id*. at 19-20). Importantly, the Court noted that the interests of public protection also counseled toward a significant sentence:

> You have proven yourself to be a danger to the community when you are at liberty. The mayhem and the repeated brazen acts of violence you brought about from November 2017 until October 2018 demonstrate that. There is a public interest in your being in a place where you can't shoot at cars or fire guns in public places.

(*Id*. at 21).

In or around mid-June 2020, the defendant filed a motion for compassionate release (the "2020 Compassionate Release Motion"), in light of the COVID-19 outbreak, and certain claimed health conditions, including hypertension, stress, and Selective Antibody Deficiency, which he claimed made him more susceptible to the ill-effects of the coronavirus. (ECF No. 501 at 4-5.) The Government opposed the 2020 Compassionate Release Motion on both jurisdictional grounds—the defendant had an appeal pending before the Second Circuit at the time of his motion—and on the merits, arguing that the defendant failed to present extraordinary and compelling reasons justifying his sentence, and because the defendant was a continuing danger to society and had served less than half of his sentence. (ECF No. 505.)

On July 8, 2020, this Court denied the defendant's 2020 Compassionate Release Motion, finding that the Court lacked jurisdiction to decide upon it, in light of the defendant's pending appeal. (ECF No. 516 at 2-3.) Further, the Court ruled that it would have also denied Jordan's § 3582(c) motion on the merits. Specifically, and without ruling whether Jordan was at a significantly heightened risk to the effects of COVID-19 (which would have established an extraordinary and compelling basis for compassionate release), the Court assessed that a reduction in Jordan's sentence was not supported under the § 3553(a) factors for two independent reasons. *First*, the Court could not find that Jordan was "not a danger to the safety of any other person or to the community, U.S.S.G. § 1B1.13(2), as is required for compassionate release" and *second*, the Court found that the §3553(a) factors did not favor release, given that Jordan had served only 19 months of an imposed 180-month sentence. (*Id.* At 7-8). Regarding the first factor, the Court noted that Jordan's crimes of conviction involved multiple acts of violence, and that those crimes came in the wake of Jordan's criminal history, which also included "violent and potentially violent offenses," and "[t]hat remains the case. The Court cannot find today that the vastly shortened sentence Jordan seeks is compatible with public safety." (*Id*. at 7-8). Regarding the second factor, the Court held that a reduction in sentence sought by Jordan would not result in a sentence commensurate with the 3553(a) factors: "The gravity of Jordan's crimes required, and requires, a meaningful sentence to protect the public from further violence; to reflect just punishment for these crimes; and to deter others from committing similar acts." (*Id*. at 8).

Jordan is currently incarcerated at FCI Allenwood-Medium. To date, he has served less than 82 months of the 180-month sentence imposed by this Court.

## II. The Defendant's Compassionate Release Motions and Bureau of Prisons Medical Records

The defendant filed this Motion on August 26, 2025. In his Motion, the defendant argues that his medical condition, chronic pancreatitis, coupled with lockdowns at FCI Allenwood Medium, and his efforts at rehabilitation constitute extraordinary circumstances warranting a reduction in the defendant's sentence from 180 months to 132 months, or in the alternative, to a total sentence that the Court deems fit. (ECF No. 711 at 3-12). Further, regarding his health condition, Jordan argues that FCI Allenwood fails to provide him with dining options that are compatible with his health condition and he claims that on one particular occasion, on June 13, 2025, he "went to health services to get help with his stomach issues" but "was met with deliberate indifference from the medical staff." *Id*. at 12.

3

The Government conferred with a member of the Bureau of Prisons ("BOP") legal staff ("Attorney-1") and obtained the defendant's medical records in connection with this Motion. (*See* Ex. A, filed under seal). Collectively, and as detailed further below, these conversations and records reflect that Jordan is receiving regular medical care at FCI-Allenwood, that his medical conditions appear to be relatively stable, and that Jordan has repeatedly failed to appear at scheduled medical appointments. Further, the Government has received from Attorney-1 a sampling of menu choices at FCI-Allenwood (attached as Exhibit B), which bely the defendant's claim that the BOP has failed to provide meal options required for his health condition. Indeed, as the medical records reveal, he has been repeatedly admonished by his doctors for making unhealthy food choices while at Allenwood. Finally, the records fail to reflect that Jordan was mistreated on June 13, 2025; indeed, it appears he did not visit medical staff at all that day. For these reasons, and those stated below, the defendant has failed to establish extraordinary and compelling circumstances warranting a sentencing reduction, and even if he did meet this burden—which he does not—the factors enumerated in 18 U.S.C. § 3553(a) counsel against the requested relief.

### III. Jordan Should Not be Released

#### A. Applicable Law

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

As courts in this District have explained, "there are three prerequisites for granting a compassionate release motion": (1) "the defendant must have exhausted his administrative rights"; (2) "the court must find that 'extraordinary and compelling reasons warrant' a reduction of sentence"; and (3) "the court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a)." *United States v. Freeman*, No. 02 Cr. 150 (LAP), 2022 WL 1785578, at *2 (S.D.N.Y. June 1, 2022). As the movant, the defendant bears the burden of proving that he is entitled to relief under Section 3582. *Id.*; *see also United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.").

The defendant is deemed to have satisfied the first prong, the exhaustion requirement, after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

As to the second prong, as the movant, "the defendant bears the burden of proving 'extraordinary and compelling reasons' exist justifying early release." *United States v. Rodriguez*, No. 88 Cr. 642 (LAP), 2022 WL 2533468, at *3 (S.D.N.Y. July 7, 2022). The Second Circuit has held that the First Step Act of 2018 "allows [district] courts independently to determine what reasons, for purposes of compassionate release, are extraordinary and compelling" and that the BOP Director is no longer the sole arbiter in determining whether the threshold is met." *See United*

*States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."); *accord United States v. Amato*, 48 F.4th 61, 66 (2d Cir. 2022).

Subsequent to *Brooker*, however, the U.S. Sentencing Commission revised the Sentencing Guidelines and updated Section 1B1.13, to "harmonize" its language with the First Step Act. *United States v. Feliz*, No. 16 Cr. 809 (VM), 2023 WL 8275897, at *4 (S.D.N.Y. Nov. 30, 2023). Accordingly, courts in this District have held that "*Brooker* does not apply to the new version of Policy Statement 1B1.13 because the Policy Statement, as amended, is now 'applicable' to compassionate release motions brought in court by defendants." *United States v. Feliz*, No. 16 Cr. 809 (VM), 2023 WL 8275897, at *4 (S.D.N.Y. Nov. 30, 2023); *accord United States v. Young*, No. 17 Cr. 364 (CS), 2024 WL 3184977, at *1 n.1 (S.D.N.Y. June 26, 2024), *aff'd* 2025 WL 1416738 (2d Cir. May 16, 2025). On that reasoning, "a court must now, in addition to finding that the other elements of the compassionate release standard are satisfied, also find that granting such relief is consistent with Policy Statement 1B1.13." *Id.*

The relevant Sentencing Commission policy statement is U.S.S.G. § 1B1.13. That statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

Section 1B1.13(b) describes the following circumstances under which "extraordinary and compelling reasons exist":

(1) Medical Circumstances of the Defendant.—

    (A) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (B) The defendant is—
        (i)   suffering from a serious physical or medical condition,
        (ii)  suffering from a serious functional or cognitive impairment, or
        (iii) experiencing deteriorating physical or mental health because of the aging process,

    that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

    (C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

>   …
>
>   (2) <u>Age of the Defendant</u>.—The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
>   ….
>
>   (5) Other Reasons.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

*Id.* § 1B1.13.

Lastly, the court's finding of such extraordinary and compelling reasons permits release but does not mandate it, for the court must still consider the Section 3553(a) factors. *United States v. Monsanto*, No. 87 Cr. 555 (LAP), 2021 WL 355049, at *2 (S.D.N.Y. Feb. 2, 2021). Where the court determines "that the Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances," the motion for compassionate release may be denied. *United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020) (finding compelling reasons warranting defendant's release but nevertheless denying motion for compassionate release because the Section 3553(a) factors "weigh[ed] heavily against [a] reduction of [the defendant's] sentence").

### B. Discussion

First, the defendant's motion should be denied because he has not presented extraordinary and compelling circumstances justifying a reduced sentence. Though Jordan does not explicitly say so, he appears to seek compassionate release under § 1B1.13(b)(1)(C), by claiming to suffer from pancreatitis, a non-fatal but long-term medical condition, which requires a "proper, low-fat meal," that, per Jordan, is not being provided by his Bureau of Prisons facility. (ECF No. 711 at 5.)

While the defendant's BOP medical records do support the claim that he suffers from pancreatitis, they also establish that his condition is being regularly monitored by BOP medical staff; that Jordan rarely claims to suffer from any significant side-effects of his pancreatitis; that Jordan frequently skips scheduled medical visits; that Jordan has access to low-fat food options; and that Jordan frequently instead opts for higher-fat commissary options, despite the recommendations of his doctors. Specifically, in the last 24 months alone:

- Jordan was seen in-person or via telehealth by gastroenterologists and/or other doctors for chronic care visits regarding his pancreatitis on at least August 5, 2025 (Ex. A at 1-2); July 17, 2025 (*Id*. at 8); October 17, 2024 (*Id*. at 39); July 10, 2024 (*Id*. at 79); April 22, 2024 (*Id*. at 91); November 29, 2023 (*Id*. at 107); and October 4, 2023 (*Id*. at 120-21).

- Notably, during those visits:

    o On August 5, 2025, Jordan's gastroenterologist noted that Jordan had refused a magnetic resonance imaging ("MRI") on July 18, 2025, and that Jordan similarly failed to appear at an appointment regarding his pancreatitis earlier in 2025. (Ex. A at 1-2, 71). During the same appointment—and despite claiming in his August 2025 compassionate release motion that the BOP is unable to provide a diet that is appropriate for his pancreatitis—Jordan indicated that he had a suspected pancreatitis flare-up, yet "[h]e is not aware of any dietary measures or activities that may have led to a flare[]." (*Id*. at 71.)

    o On July 17, 2025, just weeks before Jordan filed the instant motion claiming that "[p]rison conditions make it difficult for Mr. Jordan to consume a proper, low-fat meal" (ECF No. 711 at 5), Jordan's doctor noted that while Jordan reported "some abdominal discomfort last month *after dietary indiscretion*, [he] feels good presently." (Ex. A at 8.) (emphasis added). The defendant's doctor also noted that the doctor discussed with Jordan his "poor commissary choices" and made "specific recommendations," apparently regarding Jordan's diet. (*Id*.)

    o During a chronic care visit on October 17, 2024, Jordan noted that he "[f]eels good, has no complaints. Has not had any pancreatitis flares." (*Id*. at 39).

    o During a July 24, 2024 visit, Jordan refused an MRI of his liver (*Id*. at 78).

    o On April 22, 2024, Jordan was seen by a gastroenterologist whose findings included "[n]ormal imaging of the Pancreas with no concerning abnormalities." (*Id*. at 78, 91.)

    o During a November 29, 2023 chronic care visit, Jordan stated he "[f]eels good, has no complaints." (Ex. A at 107.)

Perhaps as notable as the appointments Jordan attended are those he skipped entirely. BOP medical records indicate that Jordan was listed a "No Show" for numerous regularly scheduled appointments, including on or about: August 1, 2025 (Ex. A at 7); May 21, 2025, when he missed his telehealth GI clinic (*Id*. at 27), yet *did* make it to the doctor after pulling a muscle in spin class days later, on June 17, 2025 (*Id*. at 15); on May 13, 2025 (*Id*. at 29); on April 23, 2025 (*Id*. at 35); February 5, 2025 (*Id*. at 36); on December 6, 2024 (*Id*. at 38); on October 1, 2024 (*Id*. at 46); June 20, 2024 (*Id*. at 84.); June 14, 2024 (*Id*. at 85); June 12, 2024 (*Id*. at 86.); May 30, 2024 (*Id*. at 88); December 28, 2023 (*Id*. at 102); November 7, 2023 (*Id*. at 115); and September 13, 2023 (Ex. A at 124).

Despite Jordan's claims that he was met with "deliberate indifference from the medical staff at FCI Allenwood/Medium" during an alleged visit on June 13, 2025, there is no medical record indicating that Jordan met with the BOP medical staff that day. Further, Attorney-1 conferred with FCI Allenwood's "Health Services" unit, which confirmed that Jordan did not report to them on that date. As noted above, Jordan's only visit to a BOP medical facility

7

throughout June 2025 was on June 17, 2025, when Jordan sought attention for an injury to Jordan's groin that he claimed to have sustained during spin class. (Ex. A at 15).

Attorney-1 also notes that, per conversations with Jordan's doctors, the defendant has been referred for a colonoscopy on numerous occasions but refuses to appear for one. This, too, is supported by the medical records. (Ex. A at 1, 12, 43, 111).

Importantly, Jordan's BOP medical records do not suggest that his physical condition has deteriorated in any meaningful way. Nor does Jordan make such a claim; to the contrary, he implicitly suggests that his condition has not worsened, and that he is making his request for a sentencing reduction in anticipation that it may worsen in the future: "Petitioner Jordan is not requesting immediate release, but instead, he is requesting a reduction in his 180-month sentence so that, as his condition worsens, he is able to receive proper medical care." (ECF No. 711 at 5.)

Taken together, Jordan's medical records make clear that the BOP is aware of Jordan's medical issues, that it has regularly met with Jordan regarding this condition, that Jordan has skipped more such meetings than he has attended, that Jordan's medical condition is and has largely been stable, and that Jordan's dietary issues are more a product of his own poor decisions than the availability of a low-fat diet.

To this last point, BOP records and information provided by Attorney-1 reveal that while FCI-Allenwood does not have a pancreatitis-specific dietary regimen, it *does* regularly offer meals and snacks that are consistent with what is recommended for those with chronic pancreatitis: a heart healthy, low-fat diet. Specifically, Attorney-1 indicates that FCI-Allenwood follows the Federal Bureau of Prisons' "National Menu," a sample of which, for the first five weeks of fiscal year 2026, is attached and incorporated by reference as Exhibit B. That document, which has a "heart" next to all heart-healthy items, reveals that there are healthy, low-fat options available regularly for breakfast, lunch, and dinner, with food choices including scrambled eggs, oatmeal, bran flakes, skim milk, chicken tacos, cilantro rice, chickpea burgers, baked potatoes, baked fish, tofu chef salad, garden salad, and fruit, among other options.

For all of the reasons above, the defendant has failed to meet his burden in establishing an extraordinary and compelling circumstance justifying his early release from prison.

Second, the defendant's Motion should be denied because of the nature and circumstances of the offense, and the need for the sentence to reflect the seriousness of the crime. As noted above, the defendant engaged in a shocking spree of shootings and other violent acts across nearly a year, and the defendant was involved in procuring firearms for Nine Trey and in dealing heroin. This prolonged and serious course of conduct warrants an equally serious and sustained prison sentence. Indeed, any one of the defendant's criminal acts—such as the instance in which he fired five shots at a moving car—would have by itself justified the imposed mandatory minimum 15-year sentence, especially when coupled with the defendant's criminal history. It is for these reasons that the Court held, at the defendant's sentencing, that this punishment was "richly warranted" and "demands a long sentence." (ECF No. 329 at 17-18). That finding remains true today.

Third, the defendant's Motion should be denied because of the need to protect the public from further crimes of the defendant and to provide adequate deterrence. The defendant's incarceration to this point has not served as a deterrent to future violent and criminal conduct because, as the Court noted in imposing sentence:

> All those prior brushes with the criminal justice system should have gotten the message across to you to stop engaging in violence lest you get caught again and serve more time in prison. Those arrests and prosecutions and sentences and times in custody should have served as wake-up calls for you, but they didn't.

(ECF No. 329 at 20). The danger this defendant posed to the community was palpable at the date of his sentencing, and remains the case today, with the defendant having served less than 82 months of the 180-month imposed sentence. Indeed, while the defendant accurately states that he "has remained free of any disciplinary action since 2022" (ECF No. 711 at 11)—a fact which will no doubt lead to significant "good time" reductions from the Court's imposed sentence—he omits that in April 2022, nearly two years *after* the Court denied Jordan's first motion for compassionate release, Jordan was disciplined by BOP after admitting to threatening bodily harm to another individual in FCI-Allenwood.

In sum, Jordan remains a danger to the community, and the Section 3553(a) factors still weigh heavily in favor of the Court's original sentence of life imprisonment, notwithstanding the defendant's current medical diagnosis.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Jonathan E. Rebold
Assistant United States Attorney
Southern District of New York
(212) 637-2512

cc: Kifano Jordan, via mail

9